## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH GARRETT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:16-cv-00372-SGC |
| | ) | |
| TYCO FIRE PRODUCTS, LP, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

Plaintiffs Joseph Garrett, Theresa Hall, Garron Mixon, Rodney Watts, Thomas Foster, and Darren Turner filed a complaint against Tyco Fire Products, LP, alleging racial harassment in violation of 42 U.S.C. § 1981. (Docs. 1, 12, 20). The court has before it the June 15, 2017 motion for summary judgment filed by Tyco. (Doc. 26). The motion was deemed submitted without oral argument as of September 28, 2017. After a thorough review of the briefs and evidence, the motion is due to be granted for the following reasons.

## I.    STATEMENT OF FACTS

Defendant Tyco Fire Products, LP ("Tyco") manufactures water-based fire suppression system components and ancillary building construction products.

---

[1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 10).

(Doc. 27-13 at 2). The six Plaintiffs are all former hourly workers at Tyco's Anniston plant who allege they were subjected to racially harassing comments and graffiti at the plant in violation of 42 U.S.C. § 1981. (Docs. 12 & 20).

## A. Tyco's anti-discrimination and anti-harassment policies

Every newly hired employee, including the six Plaintiffs, attends orientation sessions where all Tyco policies for the Anniston facility are explained. (Doc. 27-13 at 5). As part of orientation, a member of Tyco management reviews the anti-harassment and anti-discrimination policies in the employee handbook, the Tyco guide to ethical conduct, and the "Speak Up" resources. (*Id.*).

During orientation, the process of making a complaint is explained. (*Id.*). The handbook encourages employees to bring any complaints of harassment to Human Resources or to their supervisors. (*Id.*). If an employee feels uncomfortable complaining at the plant level, the handbook directs the employee to complain to the director of Human Resources for the Americas team or through the Tyco concern line contained in the handbook and posted in the plant. (*Id.* at 3, 10-12, 18-19).

Additionally, Tyco provides employees with training on various ethical issues and trains its employees on a yearly basis on the guide to ethical conduct. (*Id.* at 4, 13-17). The guide provides a website where all Tyco's policies and procedures are located. (*Id.* at 4, 16). The guide details the resources available for

an employee to lodge a complaint.  (*Id*. at 4, 13-17).  The guide also provides "Speak Up" resources, wherein several additional avenues for lodging complaints are listed, including a toll-free 1-800 concern line, legal or compliance teams, and the Tyco ombudsman office.  (*Id*. at 4, 16).   An employee can also submit a complaint via the internet.  (*Id*. at 4).

The employee handbook was published and distributed to all employees at the Anniston plant throughout the Plaintiffs' employment.  (*Id*. at 3).  A summary of both the guide to ethical conduct and the "Speak Up" resources was posted by the time clock in the plant.  (*Id*. at 18-19).

## B.  Plaintiffs' employment with Tyco

### 1.  Thomas Foster

#### a. Allegations of harassment

Thomas Foster worked at the Anniston foundry from 1996[2] until September of 2013. (Doc. 27-1 at 9, 25).  Foster's direct supervisor during his employment with Tyco was superintendent Phillip Shivers.  (*Id*. at 15).  Although his direct supervisor was David Landers when he was in the finishing department, Foster remained under the supervision of Shivers, who was in charge of the entire third shift.  (*Id*. at 15-16).

---

[2] When Foster began his employment, he worked for Central Castings.  (Doc. 27-1 at 9).  Central Castings later became Tyco.  (*Id*.).

Shivers made a single racial comment to Foster when he was working in the mold department sometime in the 2000s.  (*Id*. at 27-29).  Foster turned off the furnace to recharge it, and Shivers asked, "What the hell is going on, n*****? What happened?"  (*Id*. at 29).  Additionally, Foster testified Shivers wore a helmet with a hand-drawn lightning bolt on the side.  (*Id*. at 33).  Foster was told after his termination, in a meeting he attended with the other Plaintiffs, the lightning bolt symbolized part of the Ku Klux Klan.[3]  (*Id*. at 7-8, 33-34).

Foster testified Landers used the word "boy" on two occasions.  (*Id*. at 27, 30-32).  In March 2011, Landers said, "You need to hurry up, boy, and get this stuff cleaned up, get these shocks and stuff."  (*Id*. at 31).  In September 2013, Landers approached Foster after he mistakenly ran his forklift into the duct work in the ceiling of the plant and said, "Oh, boy, what have you done now?"  (*Id*. at 30-31).  Foster also claims someone he could only identify as "Ken" said something to the effect of "how many black men do you think I've done killed now?" after Foster complained they were working too hard.  (*Id*. at 32).

Additionally, in the summer of 2008, Foster saw a drawing in a stall in the men's restroom of a black person's face with a rope drawn around the face.  (*Id*. at

---

[3] Shivers testified he previously worked around electricity and high voltage equipment and he attached lightning bolt stickers to his helmet because it is the common symbol for working around electricity.  (Doc. 27-11 at 24).

27-28).  The next time he went to the restroom, within a month or so, it had been painted over and removed.  (*Id*. at 28).

### b. Training and reporting of allegations

Foster was trained on Tyco's policies and understood he could take complaints to his supervisor or to Human Resources.  (*Id*. at 12-13, 43).  Foster admits the policies were explained to him when he was trained on the handbook in 2003, after Tyco took over the plant.  (*Id*. at 12, 44).  Foster signed an acknowledgment form on November 11, 2003, stating, "I have received the handbook, and I understand that it is my responsibility to read and follow the policies in the handbook and any changes made to it," but testified in his deposition he did not receive a handbook on that occasion.  (*Id*.).  He testified he signed the form because he feared for his job but admitted no one threatened his job or otherwise pressured him.  (*Id*. at 11).  Foster has trouble reading but never asked anyone to read the policies to him, even though "they would [have], but [he] didn't never ask them."  (*Id*.).

Foster never made any complaints to Human Resources or to anyone else in Tyco management about any of the alleged harassing conduct at any point in time during his employment with Tyco.  (*Id*. at 13, 37).  Foster testified he did not complain because Human Resources "wouldn't do nothing."  (*Id*. at 12-13).  The first time Foster made any complaint of discrimination was when he filed his

EEOC Charge after his employment was terminated. (*Id*. at 13, 48). Foster did not identify any harassment and did not mention the "boy" or "n" comments in his EEOC charge. (*Id*. at 31, 48).

### 2. Theresa Hall

#### a. Allegations of harassment

Theresa Hall first worked for Tyco from 2001 until 2004, when she was terminated for attendance violations. (Doc. 27-2 at 7-8). She was employed subsequently from February 2013 until January 2014, when she was again terminated for attendance issues. (*Id*. at 8; Doc. 27-3 at 1).

Hall contends David Landers said "y'all" when addressing her and three other female African-American employees. (Doc. 27-2 at 23-24). Specifically, Landers would say things such as, "Y'all. Y'all lazy." and "Y'all ain't getting nothing out." (*Id*. at 23). These comments occurred 10-15 times over a 2-3 month period in late 2013. (*Id*. at 25). Aside from these "y'all" comments, Landers never directed any other supposedly racial comments at her. (*Id*. at 25). She did, however, hear Landers ask "Where Joe Garrett at? Where that boy at?" (*Id*. at 24). In addition to these comments, Hall saw lightning bolts on Phillip Shivers' helmet. (*Id*. at 28, 29; Doc. 27-3 at 35). She testified she did a Google search for "thunderbolt" and "it had something about Nazi." (Doc. 27-2 at 29).

## b. Training and reporting of allegations

During her first employment with Tyco, Hall was trained by the Human Resources manager and understood she could report any harassing behavior to her supervisor or to Human Resources. (*Id.* at 15). Hall received a handbook during her first employment and was trained on the harassment policies during her new-employee orientation. (*Id.*). Upon her re-hire in February 2013, Hall again went through new-employee orientation and was provided similar training by Human Resources assistant Heidi Chambers. (*Id*. at 12). Hall signed a form dated February 18, 2013, acknowledging she received training on the EEO policies, the employee handbook, and the topic of "Tyco Complaint Procedures; Resolution, Reporting to Chain of Command; No Retaliation, and Contact Numbers." (*Id*. at 17; Doc. 27-3 at 5). Although she signed this acknowledgement of receipt, Hall testified she never received a copy of Tyco's employee handbook and she could not recall receiving training on the harassment and discrimination policies. (Doc. 27-2 at 14, 16-17).

Hall also received training on Tyco's guide to ethical conduct and signed an acknowledgment form confirming her training. (*Id*. at 17-18, 21; Doc. 27-3 at 8). The form, signed by Hall on February 18, 2013, states: "I hereby certify that I have read and understand the information set forth in the Tyco Guide to Ethical Conduct and will comply with those policies and principles in my daily work

activities . . . Should I have a concern about a violation of Tyco policy, I will raise the concern through the appropriate channels as outlined in the Guide." (Doc. 27-3 at 8). Hall was aware of Tyco's corporate complaint hotline number and knew the number was posted in the hallway of the plant. (Doc. 27-2 at 18).

Hall never reported any of the alleged harassing conduct to anyone in Tyco management or Human Resources. (*Id*. at 26). Hall chose not to report any conduct because she "felt like [she] handled" it herself and did not want to be labeled a "snitch." (*Id*. at 15, 26). The first time Hall made any complaint of discrimination was with her February 7, 2017 EEOC charge, when she alleged she was discriminated against in her termination because of her race. (*Id*. at 11; Doc. 27-3 at 1). The EEOC charge did not make any reference to racial harassment or the alleged "y'all" or "boy" comments. (Doc. 27-3 at 1).

### 3. Garron Mixon

#### a. Allegations of harassment

Mixon worked for Tyco for three months from June 2013 until September 2013. (Doc. 27-4 at 14, 45). Mixon testified he was subjected to four instances of racial slurs from Phillip Shivers over approximately five days in September 2013. (*Id*. at 27, 30). On one occasion, Mixon asked Shivers for a pair of work gloves, and Shivers responded by saying to another individual, "[L]et me help this n***** out." (*Id*. at 27-28). On another occasion, Shivers said, "[D]amn, your black ass in

here again? I don't like you mother f*cker. I don't like you." (*Id*. at 27). Shivers also made a comment regarding Mixon's blood pressure medication, saying, "[D]amn, your black ass don't know how to take a pill?" (*Id*.). Finally, Shivers called Mixon a "lazy n*****" on one occasion when he became dizzy at work and sat down. (*Id*. at 27, 29).

Additionally, Mixon saw the phrase "I hate n*****s" written in the restroom on two occasions within approximately a one week period. (*Id*. at 36). The graffiti was later removed. (*Id*.). He could not recall if he saw racial graffiti in the restroom aside from these two occasions. (*Id*. at 37). Mixon also saw lightning bolts on Shivers' and David Landers' hardhats and equated them to a white supremacy symbol. (*Id*.).

## b. Training and reporting of allegations

Mixon attended new employee orientation and signed a form dated June 18, 2013, acknowledging the handbook, Tyco policies, and guide to ethical conduct were covered in the training and that there was "no tolerance for violence, harassment, drugs, weapons." (*Id*. at 15-17). Mixon also signed an acknowledgment of receipt of the handbook stating, "I have received the handbook, and I understand that it is my responsibility to read and follow the policies in this handbook and any changes made to it." (*Id*. at 17-18, 52). Mixon attended a one-hour training session on the Tyco guide to ethical conduct and

signed an acknowledgment confirming he read and understood the guide and he should raise any possible violations through the appropriate channels. (*Id*. at 20, 60 & 61). Mixon testified, however, he never saw these policies despite his signature on the forms acknowledging receipt of the policies. (*Id*. at 20-21).

Mixon did not report any of the alleged comments to Human Resources or Tyco management because he "didn't trust them." (*Id*. at 30). Mixon did not report the graffiti because he was told someone else reported it and he felt there was no point in doing so. (*Id*. at 38-39). Mixon did not report the lightning bolts on Shivers and Landers' helmets. (*Id*. at 38). However, after Mixon was informed of his termination by Human Resource representative Grey Terry, Mixon testified he told Terry "[W]ell you've got some people in high positions that seem to think it's okay to call somebody a lazy n****** or lazy SOB or whatever and you don't see anything wrong with that." (*Id.* at 31). In response, Mixon stated Terry told him, "[G]ood luck boy. Good luck finding you another job." (*Id*. at 33).

Mixon filed an EEOC charge on February 7, 2014, alleging discrimination in his termination. (*Id*. at 45). The allegations contained in his EEOC charge do not mention any alleged racist comments or graffiti. (*Id*.).

### 4. Rodney Watts

#### a. Allegations of harassment

Watts worked for Tyco from October 2011 until January 2016. (Doc. 27-5 at 8, 10; Doc. 27-6 at 16). Watts testified he heard the words "boy" and the "n" word "constantly" and "every day" while working at Tyco. (Doc. 27-5 at 17, 28).

Specifically, Watts testified about one incident in 2012, when he heard Phillip Shivers use the "n" word. (*Id*. at 26, 28). Shivers was frustrated with downtime on the furnace and said, "[M]an, I don't understand. Y'all n*****s. These n*****s just can't do right. Y'all n*****s - - I don't understand. Y'all n*****s just don't do right. I don't understand what the problem is." (*Id*. at 27). Watts responded by telling Shivers he could not call him that name, but Shivers did not apologize. (*Id*. at 28).

Watts testified Shivers used the word "boy" throughout the first year of Watts' employment with Tyco. (*Id*. at 26). On one occasion, Watts asked Shivers for some welding gloves, and Shivers responded, "I ain't got nothing to do with that, boy. Get out of my office." (*Id*. at 28). Another time, Watts was driving a forklift and Shivers said, "[H]ey, boy, you think you can go give one of the bull pushers a break?" (*Id*.). Watts responded, "I'm not a boy. Come on, man. I'm a man." (*Id*.). Shivers also asked a group of workers, "I want y'all boys to be

careful now. I want y'all boys to do this." (*Id*. at 29). Watts also saw the lightning bolts on Shivers' helmet and equated it with a Nazi symbol. (Doc. 27-6 at 1).

Watts testified Greg Terry also used the term "boy" on several occasions. In 2014, in response to Watts' interest in a different position, Terry said "[L]ook, boy, what you can do is come in on your off day and try and get some experience like that." (Doc. 27-5 at 30). On two occasions, Terry held the door for him when they were coming into the plant together and he said, "[C]ome on in, boy," or words to that effect. (*Id*. at 30-31). Watts also saw a tattoo of the confederate flag on Terry's right forearm. (Doc. 27-6 at 1).

Watts testified supervisors Patrick Young and Joe McLain and plant manager Paul Campbell also used the term "boy." According to Watts, Young used the word "boy" in a "sneaky way," such as in 2014 Young screamed, "[H]ey boy, I need you to put that pattern on the pattern table," when they were about to start production. (Doc. 27-5 at 33-34). Watts overheard McLain say to another person, "I got a black boy as a son-in-law . . . . I don't know why she . . . ended up marrying that boy." (*Id*. at 34). Finally, in 2014 or 2015, an employee spilled hot iron onto the floor, and Campbell came to the area and said, "[W]hat's wrong with that boy?" (Doc. 27-6 at 1-2).

Sometime in 2014, Watts saw the "n" word written on the wall of the first bathroom stall in the men's restroom. (Doc. 27-5 at 37). Although he did not tell

anyone about the graffiti, it was removed within approximately two months. (*Id.* at 38). Additionally, Watts saw a rope tied into a noose hanging from a water hydrant pipe in the back of the plant. (*Id.*). The rope was there for approximately a month, and Watts never reported it. (*Id.*; Doc. 27-6 at 1).

### b. Training and reporting of allegations

During his orientation, Tyco reviewed the handbook, anti-harassment policy, and diversity policy with Watts. (Doc. 27-5 at 9, 12-14; Doc. 27-6 at 18-22). On October 17, 2011, Watts signed an acknowledgment of training on Tyco's guide to ethical conduct and a statement he was given handouts regarding the guide. (Doc. 27-5 at 8-9 13; Doc. 27-6 at 17). Watts also signed a form the same day confirming he was trained on Tyco policies, including the anti-harassment and diversity awareness policy, the open door policy, and the Equal Employment Opportunity Policy. (*Id.* at 21-23). Watts received additional training on the guide to ethical conduct in December of 2011, 2012, and 2014. (*Id.* at 23-31).

Watts never made any complaints of race discrimination or harassment to anyone in Tyco management or to anyone in Human Resources at the plant. (Doc. 27-5 at 19). Watts testified that in May 2014, he made a telephone call to an

unknown number[4] from his cell phone, but he does not recall with whom he spoke. (*Id*. at 15-16). During the call, Watts reported supervisors were "calling black men boys and the 'n' word. And [he] didn't approve with it." (*Id.*).

On June 23, 2014, while he was still employed at Tyco, Watts filed a charge of discrimination with the EEOC alleging he was discriminated against because of his race. (Doc. 27-6 at 32). Specifically, Watts alleged he was not considered for a position because of his race, he was paid less than similarly situated white employees, and he was disciplined differently than white employees with regard to the attendance policy. (*Id*.). The allegations contained in his EEOC charge do not mention any alleged racist comments, graffiti, noose, or any other harassment. (*Id*.).

### 5. Darren Turner

#### a. Allegations of harassment

Darren Turner worked at the Anniston facility from June of 2010 until October of 2014, when his employment was terminated for leaving the plant without proper authorization from management. (Doc. 27-7 at 6, 37). Turner testified Shivers called him the "n" word on two occasions in 2011. (*Id*. at 26-29). The first time was in April 2011 when Shivers slapped the shield on Turner's

---

[4] He got the number from someone at the plant but could not recall anything about the phone call, i.e. the person's name, location, or position, other than he called a 1-800 number and the person sounded white. (Doc. 27-5 at 16).

helmet when he made a mistake in the pouring iron and called him the "n" word. (*Id*. at 26-27). Shivers again called him the "n" word in late July 2011 during a heated exchange in Shivers' office. (*Id*. at 28-29).

Turner testified Shivers used the "n" word on other occasions as well. Turner recalled a day when hand soap was smeared on the mirror in the men's bathroom and Shivers said, "[I]t wasn't nobody but that n*****," referring to Turner. (*Id*. at 32-33). Another time, Turner overheard Shivers call Mixon the "n" word when Mixon asked Shivers for a pair of work gloves. (*Id*. at 36). Turner testified Shivers also referred to him as "boy" on a regular basis. (*Id*. at 31).

Turner also testified about other employees he contends contributed to the alleged harassment. For instance, Eddie Till said, "[W]hat up boy" to Turner in the breakroom in 2012 or 2013. (*Id*. at 21). Another example was during a training session in 2012 or 2013, an unspecified person asked a question about how to tie a hangman's knot. (*Id*. at 23). Additionally, Turner testified a maintenance employee he identified as "Gaddy" told him to "get [his] black ass out there and get that damn pizza," when Turner had a pizza delivery waiting at the gate to the facility,y and when "Gaddy" brought his wife to the facility, he told Turner, "[T]his one ain't going black," in reference to his wife. (*Id*. at 22).

Finally, Turner testified he was offended by the words "master" and "slave" on two electrical boxes that operated the furnace. (*Id.* at 26). Turner saw the "n"

word written in the handicap bathroom stall on the wall in green marker sometime in 2012.  (*Id*. at 14-15).  Turner did not report it to anyone.  (*Id*. at 15).

### b. Training and reporting of allegations

Turner attended orientation when first hired and was trained on Tyco's anti-discrimination and anti-harassment policies.  (Doc. 27-7 at 10-11; Doc. 27-8 13-17).  Turner testified the handbook was reviewed with him during his orientation, but he was not given a copy to keep. (Doc. 27-7 at 10-11, 25).  On June 28, 2010, Turner signed an acknowledgement stating, "I have read the handbook, and I understand that it is my responsibility to read and follow the policies in this handbook and any changes made to it."  (Doc. 27-8 at 17).  He also signed an acknowledgment of receipt of Tyco's Equal Employment Opportunity Policy.  (*Id.* at 28).  Turner understood racial harassment was not tolerated and the anti-harassment policy was specifically covered in his orientation.  (Doc. 27-7 at 25).  He was also aware of the EEO postings in the plant located by the time clock. (Doc. 27-8 at 3-4).

Turner never complained to Human Resources representative Greg Terry about any alleged harassment.[5]  (Doc. 27-7 at 12, 34).  Turner contends he complained by responding to Phillip Shivers and Patrick Young when he did not

---

[5] Turner did complain about his pay to Terry, and the issue was resolved to Turner's satisfaction. (Doc. 27-7 at 39).

like comments they made to him. (*Id*. at 11-12, 34-35). Otherwise, he made no formal complaints to Tyco management. (*Id*. at 12).

That being said, Turner testified he sent an email in late 2010 or early 2011 to an unidentified person he described as a "heavy-set white guy" he saw on the Tyco website, complaining of discrimination. (*Id*. at 11). Turner did not recall the name, title, or role of the person he emailed. (*Id*.). Turner did not produce a copy of this email during discovery. (Doc. 28 at 30).

### 6. Joseph Garrett

### a. Allegations of harassment

Garrett began working for Tyco in November 2012 and remained employed until he was terminated on May 25, 2015. (Doc. 27-9 at 10, Doc. 27-10 at 38). Garrett identified the following allegations of racial harassment he personally observed during his employment:[6]

- Shaun Griffin said, "You don't get no raise boy!" in response to a question about a raise. (Winter 2012)

- David Landers said "You don't need nothin' new boy!" in response to a request for a new grinder wheel. (Winter 2012)

- Phillip Shivers said to Joseph Garrett, Rodney Watts, Darren Turner "Don't you boys got something to do?" after riding up on a forklift. (February)

---

[6] Garrett prepared this list the week before his deposition. (Doc. 27-9 at 27). In its recitation of the facts, Defendant omitted the incidents where co-workers relayed racial comments made by other employees outside Garrett's presence to him as double-hearsay. (Doc. 28 at 29 n.1). Plaintiff did not object to this omission and the court omits them as well.

- David Landers said "Boy you don't need no heat unless it's below 50 degrees" in response to me turning on the heat. (Winter 2013)

- David Landers said "Boy, you ain't gonna nothing but take it to the trade day (flea market) and sell it." in response to my request for a new grinder wheel and grinder Shaun Griffin was standing there as well laughing hysterically. (February 2013)

- Phillip Shivers said to me, "Boy, you haven't been here long enough to work on the melt deck." (March 2013)

- Shaun Griffin said "Boy, I'm tired of giving you people tools; Use what you have until you use it up." (March 2013)

- Tim McCloon said "Boy, you can't read!" in response to my reading of a safety label a galvanized paint can. (March 2013)

- Phillip Shivers said "Boy, you don't won't to do no work. You people always get sick when it's time to do work." This comment was in response to me getting sick while working with galvanized paint. (April 2013)

- Mike Kimball said "Boy, what the f*ck you think this is? This ain't no race track." I reported this to Philip Shivers and Greg Terry. (July 2013)

- Greg Terry said that they said you were racing. And then explained that "they" are your people. (July 2013)

- Shaun Griffin said "Stupid n*****s make me sick!" as I was walking out of his office after asking for a new grinder and grinder wheel. (August 2013)

- Phillip Shivers said "What the hell that damn n***** stop the line for?" because the parts Were coming off the line too fast? (Fall 2013)

- Greg Terry said "You people gotta do better." This comment was

made to myself and 2 other black men. (Fall 2013)

- Greg Terry said "You people do the most," in response to a group of black people joking around on break. (May 2014)

- Joe McClain said "I aint got nothing for you boy!" when I asked about a job on the melt deck. (June 2014)

- Joe McClain said to me "If you don't shave that beard, your black ass won't have a job." (August 2014)

- Don Griggs said that, "You people are always on the phone." (Spring 2015)

(Doc. 27-10 at 33-35) (emphasis omitted).

In addition to these comments, Garrett testified there was a lanyard in a back part of the plant in 2012 that he believed represented a noose. (*Id*. at 12). Garrett also saw swastikas, the "n" word, "go back to Africa," and "KKK" written on the bathroom stalls at various times throughout his employment. (*Id*. at 12-13). Each time he saw the graffiti, an employee responsible for restroom maintenance would paint over the graffiti. (*Id*.). Garrett also recounted the lightning bolts on Shivers' helmet and related them to swastika signs. (*Id*. at 13-14). He also saw the Confederate flag tattooed on Terry's forearm. (*Id*. at 14).

### b. Training and reporting of allegations

Although Garrett was scheduled to attend orientation on November 13, 2012, with seven other new hires, he was late, and Human Resources assistant Heidi Chambers provided Garrett with an individual orientation the next day.

(Doc. 27-9 at 10-11; Doc. 27-10 at 18-19). Chambers reviewed the company handbook and the policies therein with Garrett. (Doc. 27-9 at 11; Doc. 27-10 at 20). Garrett signed an acknowledgement form stating he received a copy of the handbook. (Doc. 27-9 at 11-12; Doc. 27-10 at 20). Garrett also signed a document entitled "Hourly Policy Review Outline" which contained his acknowledgment on the complaint process and concern line, directive to report harassment or other EEO issues, and Tyco's commitment to equal employment opportunity, among other items. (Doc. 27-10 at 26-27).

Garrett received training on the Tyco handbook, as well as the anti-harassment policy, anti-discrimination policy, and guide to ethical conduct. (Doc. 27-9 at 12, 16-17; Doc. 27-10 at 19, 28). Garrett understood harassment should be reported to Tyco management or to Human Resources. (Doc. 27-9 at 12). Garrett was also aware of the posting near the time clock regarding harassment and providing telephone numbers employees could call to lodge complaints. (*Id*.).

Garrett made a number of complaints to Greg Terry in 2013. Garrett complained in 2013 about Shaun Griffin using the "n" word. (*Id*. at 23-24, 36). Terry later told Garrett he addressed the issue with Griffin and to let him know if he had any further problems. (*Id*. at 24). Garrett had no further issues with Griffin. (*Id*.). Additionally, during an investigation of an incident where Garrett was accused of racing motorcycles in the parking lot with a co-worker in July

2013, Garrett complained maintenance supervisor Mike Kimbrell yelled, "Boy, this ain't no mother f*cking racetrack. Where the f*ck you think you are at?" (*Id.* at 24). Although Kimbrell denied the allegation, Terry reviewed Tyco's anti-harassment policies with him. (Doc. 27-13 at 6). Garrett did not have any further problems with Kimbrell. (*Id.* at 25). Garrett also complained to Terry that he had not received a position in the melt/mold department. (Doc. 27-9 at 39). Terry reviewed the situation and got Garrett moved into the position. (*Id.*).

Garrett filed his first charge of discrimination with the EEOC on February 14, 2014. (Doc. 27-10 at 29). In his charge, Garrett alleged he heard "boy" and the "n" word used by management at the Anniston facility. (*Id.*). Tyco Human Resources manager Dwendy "Dee" Jones investigated Garrett's allegations of harassment in his EEOC charge and met with Garrett for approximately an hour on March 6, 2014. (Doc. 27-9 at 19; Doc. 27-13 at 29-30). Jones asked Garrett to describe all his allegations of harassment and discrimination. (Doc. 27-9 at 34; Doc. 27-13 at 30, 32). According to Garrett, he told Jones about nine incidents of racial harassment,[7] although during his deposition he produced a list of twenty-four

---

[7] The incidents Garrett testified he reported to Jones are described on his list as follows: Cody Burns told me that Shaun Griffin and David Landers called me a "stupid n*****" while laughing. (Winter 2012); I asked Cody to go me a grinder wheel and Cody went to do it and was told by Shaun Griffin that "That n***** don't need no tools; Let him use what he got!" (Winter 2012); Phillip Shivers said to Joseph Garrett, Rodney Watts, and Darren Turner "Don't you boys got something to do?" after riding up on a forklift. (February); Shaun Griffin said "Boy, I'm tired of giving you people tools; Use what you have until you use it up." (March 2013); Harley told me that Phillip Shivers said "I can't wait to fire that n*****!" (April 2013); Mike Kimbrell said

incidents occurring up to that date.  (Doc. 27-9 at 27; Doc. 27-10 at 33-34).  Jones' notes of her conversation with Garrett recount three specific incidents: (1) the "boy" comment made by Kimbrell during the motorcycle racing incident; (2) a former employee told Garrett that Shaun Griffin referred to Garrett as a "damn n*****;"  and (3) another employee told Garrett he heard Shivers and Griffin say "we are going to make those n****** work."  (Doc. 27-13 at 36-37).  Garrett did not mention any graffiti to Jones.  (Doc. 27-13 at 32).

Jones asked Garrett to provide a written statement, but he refused and told Jones to use the allegations in his EEOC Charge.  (Doc. 27-13 at 33).  Jones gave Garrett her cellular telephone number to call if he had any further issues.  (Doc. 27-9 at 33; Doc. 27-13 at 33).  Although Garrett later remembered additional instances he had not recounted to Jones, Garrett never contacted Jones to supplement his conversation.  (Doc, 27-9 at 34-35; Doc. 27-13 at 33).

Jones investigated Garrett's claims and interviewed the witnesses identified by Garrett.  (Doc. 27-13 at 33-34).  She attempted to contact those witnesses who no longer worked at the plant, but none of them returned her calls.  (*Id*.).  Jones also randomly selected other employees at the plant to interview regarding the

"Boy, what the fuck you think this is? This ain't no race track." I reported this to Phillip Shivers and Greg Terry. (July 2013); Dustin told him that "Damn, we almost had that n*****, but there were pictures (freeze frames) not video of him riding his motorcycle in the parking lot." (July 2013); Greg Terry said that they said you were racing. And then explained that "they" are your people. (July 2013); Shaun Griffin said "Stupid n***** make me sick!" as I was walking out of his office after asking for a new grinder and grinder wheel. (August 2013). (Doc. 27-9 at 27; Doc. 27-10 at 33-34).

plant environment. (*Id*. at 30). No one interviewed corroborated Garrett's claims. (*Id*. at 33).

Garrett filed a second EEOC charge on October 2, 2014. (Doc. 27-10 at 36). In his charge, he complained he was denied a machinery maintenance II position on June 24, 2014, because of his race and in retaliation for his prior charge. (*Id*.). Garrett did not make any allegations of harassment or that Tyco's investigation into his first EEOC charge was inadequate. (*Id*.).

Tasia Jones replaced Greg Terry as the director of Human Resources at the facility in December of 2014. (Doc. 27-13 at 3). Garrett made a complaint about his move from the melt/molding department. (Doc. 27-10 at 1). While lodging that complaint, Garrett told Tasia Jones the term "boy" and the "n" word "were used loosely within the plant. (Doc 27-9 at 40). Specifically, Garrett told Jones that Joe McClain previously told a co-worker Garrett was a "sorry n*****," and Shaun Griffin previously told someone his grandfather was the grand wizard of the KKK, both of which occurred months before Jones arrived at the facility. (*Id*.). Garrett also told Jones' supervisor, Richard Oakes, about the comment by McClain. (Doc. 27-10 at 1).

Garrett's complaint was resolved to his satisfaction when he was allowed to return to the melt/molding department. (*Id*.). Jones told Garrett she "handled" the

issues raised about Griffin and McClain.  (*Id*.).  Garrett testified the only problem he had thereafter was "little picking" and scrutiny of his work. (*Id*.).

Garrett filed a third charge of discrimination with the EEOC after his termination.  (Doc. 27-10 at 38).  In that charge, Garrett alleged he was "subjected to racially derogatory terms such as boy and n*****."  (*Id*.).  He contended he was denied a promotion and terminated because of his race and in retaliation for his previous charges of discrimination.  (*Id*.).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## III. DISCUSSION

To establish a racially hostile work environment, a plaintiff must show (1) he or she belongs to a protected group; (2) he or she has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the hostile environment under a theory of vicarious or direct liability.[8] *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982). Defendant does not dispute

---

[8] Plaintiffs' claims under Section 1981 "have the same requirements of proof and use the same analytical framework" as claims under Title VII of the Civil Rights Act of 1964. *Shields v. Fort James Corp.,* 305 F.3d 1280, 1282 (11th Cir. 2002).

Plaintiffs belong to a protected group or that the harassment alleged was unwelcome. Rather, Defendant asserts some of the alleged harassment was not based on race,[9] and the alleged racial harassment was not sufficiently severe or pervasive to affect their terms and conditions of employment. (Doc. 26 at 37-62). Further, Defendant contends Plaintiffs cannot establish Tyco's liability for the alleged conduct because, except for Garrett, they never complained to the proper officials. (*Id*. at 62-76). As for Garrett, Defendant argues he acted unreasonably by not cooperating in the investigation and as a result his claim is barred as a matter of law. (*Id*. at 76-80).

### A. The record presents a genuine dispute of material facts as to whether the harassment was severe and pervasive only for Watts, Turner, and Garrett.

The "severe and pervasive" requirement is the "crucial" element in most harassment claims. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), overruled on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "Requiring the plaintiff to prove that the harassment is severe and pervasive ensures that Title VII does not become a mere general civility code." *Id*. (internal quotations and citation omitted). This requirement contains both an objective and a subjective component. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993); *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999). To

---

[9] Although argued by Defendant, the court does not discuss the element requiring the harassment to be "based on race." The court assumes, without deciding, this element is met.

be actionable, the behavior must result in both an environment "that a reasonable person would find hostile or abusive" and an environment that the victim "subjectively perceive[s] . . . to be abusive." *Harris*, 510 U.S. at 22. In evaluating the objective severity of the harassment, the court considers: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citation omitted).

The court looks to the totality of the circumstances instead of requiring proof of each factor individually. *Harris*, 510 U.S. at 23. The "mere utterance of an . . . epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment." *Harris*, 510 U.S. at 21 (internal quotations and citations omitted). "Racial slurs spoken by co-workers ha[ve] to be so 'commonplace, overt and denigrating that they create[ ] an atmosphere charged with racial hostility.'" *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)). Only when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employment and create an abusive working environment," is the law violated. *Harris*, 510 U.S. at 21 (internal quotations and citations omitted).

Before discussing the facts of each Plaintiff's claim, the court finds the Eleventh Circuit opinion in *Adams v. Austal, U.S.A., LLC*, 754 1240 (11th Cir. 2014), instructive. In *Adams*, the plaintiffs complained of pervasive racist conduct at the defendant's facility, including nooses being displayed, racist and sexually laden graffiti drawn on the walls of bathrooms and boats, repeated use of racist slurs and comments, an African American being kicked, and the wearing of pervasive Confederate flag apparel by supervisors and co-workers. *Id*. at 1246. Of the thirteen appealing plaintiffs, the Eleventh Circuit found seven presented an issue of fact as to severity or pervasiveness. *Id*. at 1251-57. The Court primarily based its determination on the conduct to which the plaintiffs were actually exposed and the extent to which it was directed at them. *Id.* For example, a plaintiff who discovered two nooses, was the subject of a crude drawing, and personally witnessed racist comments, physical abuse, and pervasive Confederate flag apparel stated a sufficient claim. *Id*. at 1251-52. The same was true of plaintiffs who were the subject of racial slurs, discovered nooses hanging, or very frequently observed the above-described conduct. *Id*. at 1252-54. In contrast, the Court found plaintiffs who were not the subject of racist slurs and comments and did not discover the nooses, but only heard about them, did not present an issue of fact. *Id*. The Court made this finding despite the fact these plaintiffs observed

racist graffiti and Confederate flag apparel on a daily basis, heard racist slurs and comments being made, and were aware of the nooses being hung. *Id*. at 1254-57.

The undersigned now turns to the individual allegations of harassment made by each Plaintiff. For the reasons explained below, Plaintiffs Foster, Hall, and Mixon did not establish the harassment they experienced was sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatory abusive working environment. Plaintiffs Watts, Turner, and Garrett have established the harassment they experienced was sufficiently severe and pervasive, and therefore, these three Plaintiffs established a hostile work environment claim for the purposes of summary judgment.

### 1. Thomas Foster[10]

The record does not present a genuine dispute of material fact concerning Foster's work environment. Foster's racial harassment claim consists of the following: (1) the use of the "n" word one decade ago; (2) the use of "boy" twice over a two-year period; (3) an ambiguous comment by an unidentified employee about working black people to death; and (4) racial graffiti that was eight years old when the complaint was filed.[11] (Doc. 27-1 at 27-32). This racist language

---

[10] The court will not generally recount each allegation made by each Plaintiff but refers to the statement of facts in Section I.

[11] Foster also testified about the lightning bolts on Shivers' helmet, but he did not attribute them to any racial animus until after he no longer worked for Tyson. (Doc. 27-1 at 34). The court does not consider this as evidence of racial harassment since Foster was not aware of it during his employment. *Adams*, 754 F.3d at 1250 ("A reasonable person in the plaintiff's position is not

and observation of racial graffiti are too sporadic and isolated to establish harassment so objectively severe and pervasive as to alter the terms and conditions of Foster's employment. *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008); *Fortson v. Carlson*, 618 F. App'x 601, 607 (11th Cir. 2015) (nine racially derogatory comments over two-and-a-half years insufficient to support a hostile work environment claim); *Freeman v. City of Riverdale*, 330 F. App'x 863, 866 (11th Cir. 2009) (eleven incidents of racially derogatory language over a thirteen-year period of employment insufficient to support a hostile work environment claim); *Gullatte v. Westpoint Stevens, Inc.,* 100 F. Supp. 2d 1315, 1322-23 (M.D. Ala. 2000) (three racial epithets over an eight-year period of employment were sporadic and not sufficiently severe or pervasive to constitute a hostile work environment). Additionally, the conduct was not physically threatening or humiliating, and Foster did not present evidence the conduct interfered with his job performance. Therefore, Foster's allegations are insufficient to support a hostile work environment claim, and summary judgment is due to be granted as to Foster's claim against Tyco.

### 2. Theresa Hall

The record also does not present a genuine dispute of material fact concerning Hall's work environment. Like Foster, Hall's contentions are too

---

one who knows what the plaintiff learned only after her employment ended or what discovery later revealed.").

sporadic and isolated to be considered severe and pervasive as a matter of law.

Hall's allegations of a racially hostile work environment, including ten to fifteen

"y'all" comments[12] over a two to three month period and hearing Garrett referred

to as "boy"[13] (Doc. 27-2 at 23-25) over the span of one year of employment, do not

give rise to an actionable hostile work environment claim. *See McCann*, 526 F.3d

at 1379; *Bowens v. Knox Kershaw, Inc.*, 2015 WL 9315611, at *8-9 (M.D. Ala.

Nov. 13, 2015) (eleven incidents over five months, including use of phrase "y'all

people" by supervisor, did not give rise to a hostile work environment claim); *Kent

v. St. Joseph's/Candler Hosp.*, 2010 WL 3282991, at *5-6 (S.D. Ga. July 6, 2010)

(use of the phrase "you people" was insufficient to give rise to a hostile work

environment claim); *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314,

1323 (M.D. Fla. 2002) (plaintiff failed to establish claim of racially hostile work

environment where comments, including phrase "you all," were not severe or

pervasive). Additionally, the conduct was not physically threatening or

humiliating, and Hall did not present evidence the conduct interfered with her job

---

[12] There is no suggestion in Hall's testimony the word "y'all" was being used as a racial insult.
*See Ambus v. AutoZoners*, LLC, 71 F. Supp. 3d 1280, 1300 (M.D. Ala. 2014) ("As to the
statements and conduct not expressly related to race, although words not directly related to race
may sometimes constitute racial harassment, there must be a surrounding context in which it is
clear that a comment is intended as a racial insult.") (internal quotations omitted).

[13] The impact of hearing a comment about someone else is necessarily below the impact of
comments directed to a plaintiff. *See, e.g., Smith v. Northeastern Illinois Univ*., 388 F.3d 559,
567 (7th Cir. 2004) ("impact of 'second-hand harassment' is obviously not as great as the impact
of harassment directed at the plaintiff").

performance.  Hall's allegations are insufficient to support her claim as a matter of law, and summary judgment is due to be granted as to Hall's claim against Tyco.

### 3.  Garron Mixon

The record also does not present a genuine dispute of material fact concerning Mixon's work environment.  Mixon testified the following harassment occurred during his three-month employment: (1) the use of the "n" word on two occasions and the use of "black ass" on two occasions over the course of one week, (2) two instances of racist graffiti which were both later removed, and (3) lightning bolts on Shivers' and Landers' helmets.  (Doc. 27-4 at 27-30, 36-37).  However offensive the conduct may be, the racial harassment must be severe and pervasive and the work atmosphere "permeated with discriminatory intimidation, ridicule, and insult."  *Harris*, 510 U.S. at 21.  Mixon's allegations fail to rise to this level. Instead, his assertions are more akin to the allegations made by the plaintiffs whose claims failed in *Adams*.  *Adams,* 754 F.3d at 1254 (conduct was not sufficiently severe or pervasive where an African-American plaintiff "saw his coworkers wear the Confederate flag on a regular basis," "saw racist graffiti in the men's restroom that he used on a daily basis," "heard people say the slur 'n*****,' but only a 'few times,'" and heard about a noose being left in the breakroom, though he did not see it himself); *see also Barrow v. Georgia Pac. Corp.*, 144 F. App'x 54, 57 (11th Cir. 2005) (display of the rebel flag on tool boxes and hard hats, letters KKK appearing

on bathroom wall and block-saw console, use of the "n" word three times or more a year, noose in employee's locker, and other isolated racial slurs, while offensive, were not so severe or pervasive as to alter conditions of employment). Although the use of racial epithets is never appropriate, case law makes clear, that occasional use, by itself, of even the most incendiary epithets fails to result in actionable conduct. *See, e.g., Harrington v. Disney Reg'l Entm't, Inc*., 276 F. App'x 863, 875-77 (11th Cir. 2007) (although offensive, reference to plaintiff as "lazy n*****" and occasional use of term "ghetto" did not amount to actionable conduct for racial harassment claim); *Fortson v. Columbia Farms Feed Mill*, 34 F. Supp. 3d 1302, 1305-08 (M.D. Ga. 2014) (twelve racially derogatory comments in a seven month span, over two years of employment, insufficient to support a hostile work environment claim); *Joseph v. Fla. Quality Truss Indus., Inc.*, 2006 WL 3519095, at *10 (S.D. Fla. Dec. 6, 2006) ("the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII.").

Additionally, the conduct was not physically threatening or humiliating, and Mixon did not present evidence the conduct interfered with his job performance. The court does not condone the racist language or graffiti to which Mixon was subjected, but taken as a whole, it does not rise to the level of conduct required to establish the severe and pervasive prong by Eleventh Circuit precedent.

Therefore, summary judgment is due to be granted as to Mixon's claim against Tyco.

### 4. Rodney Watts

The record presents a genuine dispute of material facts that Watts' workplace was objectively hostile. Watts' testimony reflects harassment that was more severe and frequent than alleged by Foster, Hall, and Mixon, and more akin to the *Adams* plaintiffs who presented an issue of fact as to the severity or pervasiveness of the harassment. Watts was employed for over four years at Tyco and testified he heard "boy" and the "n" word "every day" and "constantly." (Doc. 27-5 at 17, 28). He testified his supervisor, Shivers, used the "n" word and called him "boy" on a number of occasions. (*Id*. at 26-29). Other supervisors, specifically Young and McLain, and plant manager Campbell called him and other African American employees "boy." (*Id*. at 33-34; Doc. 27-6 at 1-2). Additionally, Greg Terry the Human Resources manager referred to Watts as "boy" on several occasions and had a Confederate flag tattooed on his right forearm. (Doc. 27-5 at 30-31; Doc. 27-6 at 1). Watts also saw the "n" word written on a bathroom wall and a rope tied into what he described as a noose hanging in the back of the plant. (Doc. 27-5 at 37; Doc. 27-6 at 11). A noose is a historically-significant symbol of race-based oppression and has consistently been held as a severe form of racial harassment. *See Adams*, 754 F.3d at 1253.

Because of the frequency with which he was called "boy" and the "n" word, combined with his viewing of the racist graffiti and noose, a reasonable jury could find his workplace was objectively hostile. *Id.* (plaintiff Reed heard racial slurs every day, saw employees and supervisors wear Confederate shirts every day, and saw racial graffiti every day); *Mack v. ST Mobile Aero Eng'g, Inc*., 195 F. App'x 829, 838 (11th Cir. 2006).

### 5. Darren Turner

The record presents a genuine dispute of material facts that Turner's workplace was objectively hostile. Turner's testimony reflects harassment that was more severe and frequent than expressed by Foster, Hall, and Mixon, and more akin to the *Adams* plaintiffs who presented an issue of fact as to the severity or pervasiveness of the harassment. Turner testified that during his four-year employment, his supervisor, Shivers, called him "boy" every day and the "n" word directly on two occasions and referred to him as the "n" word on another occasion. (Doc. 27-2 at 26-33, 36). On one of the occasions where Shivers called Turner the "n" word, Shivers got close to Turner's face and slung the shield of Turner's helmet up, and Turner felt intimidated. (*Id*. at 26-27). Turner overheard Shivers refer to Mixon as the "n" word. (*Id*. at 36). He also heard racial slurs, including the terms "boy" and "black ass," from other hourly employees. (*Id*. at 21-23). Turner was present when someone asked about tying a hangman's knot during a

meeting. (*Id*. at 23). Turner also saw racial graffiti one time in the bathroom, saw the lightning bolts on Shivers' helmet, and saw the word "master" and "slave" written on electrical boxes. (*Id*. at 14-15, 26).

Turner's allegations are sufficient to raise a question of fact as to the severity and pervasiveness of the alleged harassment. Turner testified he frequently experienced racial harassment from both his supervisor and co-workers and saw racist graffiti. Additionally, Turner felt physically intimidated during one of the incidents where his supervisor called him the "n" word. A reasonable jury could find his workplace was objectively hostile. *See Adams*, 754 F.3d at 1254.

### 6. Joseph Garrett

The record also presents a genuine dispute of material facts that Garrett's environment was objectively hostile. Like Watts and Turner, Garrett's allegations are analogous to the surviving *Adams* plaintiffs. Garrett experienced racial slurs, including the "n" word, "boy," "you people" and "your black ass," from both supervisors and co-workers, on a regular basis throughout his over three-year employment with Tyco. (Doc. 27-10 at 33-35). Garrett saw what he described as a noose and lightning bolts on Shivers' helmet, and racial graffiti including swastikas, the "n" word, "Go Back to Africa" and "KKK," written in the bathroom. (*Id*. at 12-14). He also saw the Confederate flag tattooed on the forearm of Terry, the Human Resources manager. (*Id*. at 14). Taken as a whole, and considered in

context and not as isolated incidents, a reasonable jury could find his workplace was objectively hostile. *Id.* at 1253 (every day plaintiff Reed heard racial slurs, saw employees and supervisors wear Confederate shirts, and saw racial graffiti); *Mack,* 195 F. App'x at 838.

In summary, Defendant is entitled to summary judgment on the harassment claims asserted by Plaintiffs Foster, Hall, and Mixon because they did not establish the harassment they experienced was sufficiently severe or pervasive to alter the terms and conditions of their employment and create a discriminatory abusive working environment. Plaintiffs Watts, Turner, and Garrett have established a hostile work environment claim for the purposes of summary judgment. The analysis of their claims, however, does not end with this determination. The court next turns to Defendant's affirmative defense established by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ("*Faragher-Ellerth* defense").

### B. Tyco's liability

Even if the harassment is severe and pervasive enough to result in a hostile work environment, an employer can avoid liability for that hostile work environment by maintaining an effective policy against harassment. *Faragher*, 524 U.S. at 807. In *Faragher* and *Ellerth*, the Supreme Court established an affirmative defense when a plaintiff establishes a hostile work environment. The

*Faragher-Ellerth* defense has two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. Because it is an affirmative defense, the employer bears the burden of establishing both elements. *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007).

### 1. Tyco exercised reasonable care to prevent and promptly correct any alleged harassing behavior.

There is not a uniform test for determining whether an employer's policy demonstrates it exercised reasonable care. The mere existence of a formal anti-harassment policy does not satisfy this first prong. *See, e.g. Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) (noting the employer failed to establish that its policy contained reasonable complaint procedures). An employer's policy fulfills its "prevent harassment" obligation if the employer promulgates a policy that is "comprehensive, well-known to employees, vigorously enforced, and provides alternate avenues of redress[;] and the policy must not be administered "in bad faith" or be otherwise "defective or dysfunctional." *Dinkins v. Charoen Pokphand USA, Inc*., 133 F. Supp. 2d 1237, 1251 (M.D.Ala. 2001) (citing *Farley v. American Cast Iron Pipe Co*., 115 F.3d 1548, 1554 (11th Cir. 1997) and *Madray v. Publix Supermarkets, Inc.*, 208 F.3d

1290, 1298 (11th Cir. 2000)). "A policy is 'defective' if those responsible for its enforcement lack training and knowledge sufficient to recognize, prevent and correct workplace discrimination." *Id.* Essentially then, an employer can establish it exercised reasonable care to prevent harassment by showing it promulgated and effectively disseminated a clear anti-harassment policy with complaint procedures to its employees, as long as the complaint procedures "meet the minimum requirements for the *Faragher* affirmative defense . . . [and do] not require . . . the employee to complain to the offending supervisor or through the supervisor's chain of command and . . . provide[ ] multiple avenues of lodging a complaint to assessable, designated representatives." *Madray*, 208 F.3d at 1299; *see also Olson v. Lowe's Home Ctrs. Inc.*, 130 F. App'x. 380, 389 (11th Cir. 2005) (finding satisfaction of the first prong as the policies enabled employees to bypass harassing supervisors and provided several different avenues for employees to report harassment). This "requires . . . a clear and known policy against workplace harassment . . . [including] permit[ting] employees to bypass supervisors and retain some vestige of anonymity." *Bury v. Sky Chefs*, 2011 WL 197383, at *6 (S.D. Fla. Jan. 20, 2011).

Tyco's anti-harassment policies prohibit all forms of harassment, provide alternate avenues for employees to report any harassing conduct, and were disseminated to employees, including all Plaintiffs, through orientation, training,

publication in both the employee handbook and the guide to ethical conduct, and postings in the facility. *Farley*, 115 F.3d at 1553 (policy expressly prohibiting sexual harassment, providing multiple avenues to report harassment, and was disseminated and communicated to staff was reasonable). Plaintiffs do not identify any aspect of Tyco's written policies as defective. Defendant has proven each Plaintiff received training on the handbook and the guide to ethical conduct, both of which discuss the anti-harassment policy and the available avenues for complaints by employees.

Some Plaintiffs argue they were never given a copy of the employee handbook to take home. This argument is without merit. Every Plaintiff admitted signing multiple forms acknowledging they were provided training on and receipt of the handbook and guide to ethical conduct. Turner signed two such forms; Foster, Hall, Watts, and Garrett signed three forms; and Mixon signed four forms. Plaintiffs do not allege they fraudulently signed those forms or that any type of fraud prevented them from reading the documents.[14] Additionally, Plaintiffs do not dispute being trained on the anti-harassment policy and the avenues to report any perceived harassment.

---

[14] Foster testified he had trouble reading but acknowledged a Human Resources representative would have read the provisions to him if he had requested it, which he did not. (Doc. 27-1 at 11).

The undersigned, therefore, concludes Defendant has satisfied the first element of the *Faragher-Ellerth* defense. The complaint procedures established by Tyco's harassment policy meet the minimum requirements for the *Faragher-Ellerth* affirmative defense because the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to assessable, designated representatives.

### 2. Plaintiffs unreasonably failed to take advantage of the corrective opportunities offered by Tyco.

Under the second step of the *Faragher-Ellerth* defense, the court must assess whether Plaintiffs unreasonably failed to take advantage of the preventative or corrective opportunities provided by Tyco to avoid harm. For an employee to reasonably use the employer's complaint procedures to report harassment, the employee must (1) complain to an appropriate person designated to receive complaints and (2) sufficiently articulate the complaint to put the employer on notice of the harassment. *Coates v. Sudor Brands, Inc*., 164 F.3d 1361, 1364 (11th Cir. 1999). If an employer establishes procedures for employees to report harassment and designates specific individuals to receive complaints, "then it is incumbent upon the employee to utilize the procedural mechanisms established by

the company."[15]   *Madray*, 208 F.3d at 1300.   By establishing the specific

procedures to take in reporting harassment, an employer has through its policy

"answered the question of when it would be deemed to have notice of the

harassment" and thereby become responsible for taking corrective action.  *Coates*,

164 F.3d at 1364; *see also Madray*, 208 F.3d at 1300.  Therefore, in most cases,

speaking informally to someone not designated by the policy to receive harassment

complaints is insufficient to put an employer on notice as a matter of law.  *Madray*,

208 F.3d at 1300.

Concerning co-workers, an employer is liable for co-worker harassment if

the employer knew (actual notice) or should have known (constructive notice) of

the harassing conduct but failed to take prompt remedial action.  *See, e.g., Miller*,

277 F.3d at 1278; *Breda v. Wolf Camera and Video*, 222 F.3d 886, 889 (11th Cir.

2000).  After notice is established, a plaintiff must show the employer "failed to

take immediate and appropriate action." *Watson v. Blue Circle, Inc*., 324 F.3d

1252, 1259 (11th Cir. 2003); s*ee also Frederick,* 246 F.3d at 1314; *Minix v. Jeld–

Wen, Inc*., 237 F. App'x 578, 583 (11th Cir. 2007).   The action must be

---

[15] "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [affirmative] defense."  *Madray*, 208 F.3d at 1301 (citations omitted).

"reasonably likely to prevent the misconduct from recurring." *Kilgore v. Thompson & Brock Mgt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).

The court now turns to the individual Plaintiffs. For the reasons explained below, the court concludes Defendant established the second element with regard to each Plaintiff. Plaintiffs Foster, Hall, Mixon, Watts, and Turner failed to utilize the reporting procedures established by Tyco. As such, these Plaintiffs failed to put Tyco on notice as a matter of law. As to Garrett, the court concludes Garrett's decision not to fully report all his allegations of harassment or to otherwise cooperate in Tyco's investigation bars his claim as a matter of law.

### a. Thomas Foster

Foster never made any complaints to anyone in Human Resources or Tyco management about any alleged harassment during his employment. Even his EEOC charge, filed after his termination, did not mention any alleged harassment. Additionally, Foster's subjective conclusion that any complaint he made would have been automatically considered meritless is insufficient to alleviate him of his responsibility to report. *See Walton v. Johnson and Johnson Servs., Inc.*, 347 F.3d 1272, 1290-91 (11th Cir. 2003) ("[s]ubjective fears of reprisal may exist in every case, but . . . those fears, standing alone, do not excuse an employee's failure to report a supervisor's harassment."). Therefore, Tyco established the second

element of the *Faragher-Ellerth* defense with regard to Foster because he failed to use the reporting procedures established by Tyco. *See Madray*, 208 F.3d at 1300.

### b. Theresa Hall

Hall never reported any of the alleged harassment to Tyco management or Human Resources. Additionally, Hall's EEOC charge, filed after her termination, did not mention any alleged harassment. Hall's testimony that she did not want to be labeled a "snitch" does not excuse her failure to report. Conclusory allegations or feared repercussions fail to overcome the unreasonableness of an employee's failure to report harassment. *Id.*; *Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship*, 490 F.3d 1302, 1310-11 (11th Cir. 2007). Otherwise "[e]very employee could say . . . she did not report the harassment earlier for fear of losing her job or damaging her career prospects." *Baldwin*, 480 F.3d at 1307. Therefore, Tyco established the second element of the *Faragher-Ellerth* defense with regard to Hall because she failed to use the reporting procedures established by Tyco. *See Madray*, 208 F.3d at 1300.

### c. Garron Mixon

Mixon never reported any of the alleged harassment to Tyco management or Human Resources during his employment. Mixon's EEOC charge, filed after his termination, did not reference any of the alleged harassment. After being notified of his termination, Mixon does allege that he told Greg Terry, "[W]ell you've got

some people in high positions that seem to think it's okay to call somebody a lazy n****** or lazy SOB or whatever and you don't see anything wrong with that." (*Id.* at 31). This statement, however, does not meet Mixon's obligations under *Faragher* and *Ellerth*. An employee has the burden of proving he made a clear and specific complaint to give the employer notice he is complaining about racial harassment. Mixon's comment, especially considering it was made in the context of his termination, did not identify any specific speakers, equated "lazy n*****" with "lazy SOB" and "whatever," and did not adequately apprise Terry of a problem requiring his attention. Mixon's comment was too vague to be considered an appropriate complaint to put Tyco on notice as a matter of law. *See*, *e.g.*, *Madray,* 208 F.3d at 1300-01; *Leeth v. Tyson Foods, Inc.,* 449 F. App'x 849, 853 (11th Cir. 2011) (plaintiff did not overcome *Faragher* defense where her "complaints were very vague"); *Odom v. Fred's Stores of Tenn., Inc.*, 2013 WL 6498499, at *10 (M.D. Ga. Dec. 11, 2013) (*Faragher* defense established where employee only made vague complaints and "did not articulate a complaint sufficient to put the company on notice of sexual harassment"). Therefore, Tyco established the second element of the *Faragher-Ellerth* defense with regard to Mixon because he failed to use the reporting procedures established by Tyco. *See Madray*, 208 F.3d at 1300.

### d. Rodney Watts

Watts never reported any of the alleged harassment to Tyco management or Human Resources during his employment. Watts' EEOC charge, filed after his termination, did not reference any of the alleged harassment. Watts testified, however, he made a complaint by telephone from his cell phone to an unidentified 1-800 number in May of 2014.[16] (Doc. 27-5 at 15-16). During the call, Watts reported supervisors were "calling black men boys and the 'n' word. And [he] didn't approve with it." (*Id.*).

This vague and self-serving testimony is insufficient to establish a proper complaint as a matter of law. Tyco has a legal right to identify the proper officials to whom complaints should be made, and Watts' allegations are insufficient to put the employer on notice of a complaint. *See Madray*, 208 F.3d at 1300 ("Publix cannot be considered to have been placed on notice of [the] harassing behavior by the plaintiff's informal complaints to individuals not designated by Publix to receive or process sexual harassment complaints."). Tyco clearly identified the paths available to Watts to complain, and his testimony does not establish he took advantage of those procedures. *See Fodor v. Eastern Shipbuilding Group*, 2014 WL 1478845, at *6 (N.D. Fla. April 15, 2014) (court may reject a plaintiff's

---

[16] He got the number from someone at the plant but could not recall anything about the phone call, i.e. the person's name, location, or position, other than he called a 1-800 number and the person sounded white. (Doc. 27-5 at 16).

claimed report of harassment to unidentified supervisors); *Dixon v. Rave Motion Pictures, Inc.*, 2006 WL 4483152, at \*13 (M.D. Ala. Oct. 24, 2006) (plaintiff's claims she "made several complaints to the corporate offices about Mr. Bryant's racially discriminatory actions at the theater" is devoid of specific facts which would permit the court to determine whether the "several complaints to the corporate offices" constituted protected activity). Therefore, Tyco established the second element of the Faragher-Ellerth defense with regard to Watts because he failed to use the reporting procedures established by Tyco. *See Madray*, 208 F.3d at 1300.

### e. Darren Turner

Tuner never reported any of the alleged harassment to Tyco management or Human Resources during his employment. The court rejects Turner's characterization of his testimony in his brief regarding his alleged complaints to Phillip Shivers, Patrick Young, and Greg Terry. Turner's statement of "you're being a racist" to Shivers when he made an inappropriate remark is insufficient as a matter of law to put Tyco on notice Turner was lodging an official complaint of harassment. *See Madray*, 208 F.3d at 1300. Similarly, Turner's comment to Young he felt Young was being racist when he asked Turner to help pour iron for an injured worker is insufficient. *Id*. Additionally, Turner's complaint to Terry about the gun policy does not serve as a complaint to give Tyco sufficient notice of

the existence of any racial harassment. *See Coates*, 164 F.3d at 1364-65 (vague or ambiguous comments, even when made to a person designated to heard complaints are insufficient to put an employer on notice).

Turner also testified he sent an email complaining of discrimination in late 2010 or early 2011 to an unidentified person he described as a "heavy-set white guy" he saw on Tyco's website. (Doc. 27-7 at 11). Turner did not recall the name, title, or role of the person he emailed and did not produce a copy of this email during discovery. (*Id*.; Doc. 28 at 30). As with Watts, Turner's speculative and self-serving testimony does not establish he used the complaint procedure identified by Tyco. *See*, *Fodor*, 2014 WL 1478845, at *6; *Dixon*, 2006 WL 4483152, at *13. Tyco clearly identified the paths available to Turner to complain, and his testimony does not establish he took advantage of those procedures. Therefore, Tyco established the second element of the *Faragher-Ellerth* defense with regard to Turner because he failed to use the reporting procedures established by Tyco. *See Madray*, 208 F.3d at 1300.

### f. Joseph Garrett

Garrett is the only Plaintiff who reported harassment to Tyco. Garrett made a number of complaints to Greg Terry in 2013, two of which involved alleged harassment. Garrett complained in early 2013 about Shaun Griffin using the "n" word. (*Id*. at 23-24, 36). Terry later told Garrett he addressed the issue with

Griffin and to let him know if he had any further problems. (*Id*. at 24). Garrett had no further issues with Griffin. (*Id*.). Additionally, Garrett complained to Terry about maintenance supervisor Kimbrell calling him a "boy" after the drag racing incident in July 2013. (*Id*.). Although Terry did not find any corroborating evidence, he verbally counseled the employee. (Doc. 27-13 at 6). Garrett testified he had no further problems with Kimbrell.

Regarding these complaints, Tyco's actions constitute immediate and appropriate corrective action, and therefore, Tyco cannot be held liable for the alleged conduct. After Garrett reported the inappropriate conduct in each instance, Terry spoke with the people involved and Garrett either did not have any further problems with the people involved, or did not report any further problems. Such measures are sufficient as a matter of law. *See Faragher*, 111 F.3d at 1535; *Fleming v. Boeing Co.*, 120 F.3d 242, 246-47 (11th Cir. 1997) (talking to the harasser and telling the complainant to report any further problems was, as an initial measure, enough to constitute "immediate and appropriate corrective action").

The other time Garrett complained of racial harassment was through his February 2014 EEOC charge. (Doc. 27-10 at 29). Tyco assigned Dwendy Jones to investigate the allegations contained in Garrett's EEOC charge. (Doc. 27-9 at 19). Garrett met with Dwendy Jones on March 6, 2014, and reported nine incidents of

alleged harassment. (*Id*. at 27; Doc. 27-10 at 33-34). Jones offered Garrett the chance to provide a written statement, but Garrett refused and told Jones to use the allegations in his EEOC charge. (Doc. 27-13 at 33). Additionally, Jones gave Garrett her cell phone number if he needed to add anything to his complaint, and Garrett never called her. (*Id*.; Doc. 27-9 at 33-34).

During their meeting, Jones asked Garrett to tell her about each and every incident of harassment. (Doc. 27-9 at 34). Garrett admits, however, he did not inform Jones about all the harassment he experienced. He only told Jones about nine of the alleged twenty-four incidents he recalled in preparation for his deposition. (*Id*. at 27; Doc. 27-10 at 33-34). Garrett contends he could not remember some of the incidents he recalled three years later because he did not know when Jones was coming to talk to him about his EEOC charge and he did not have time to prepare and think about it. (Doc. 34 at 77-78). Additionally, Garrett contends he withheld information from Jones because she was in an "adversarial position to Garrett" because two of Garrett's co-workers made complaints against him. (*Id*. at 78).

Garrett's arguments do not excuse his failure to inform Tyco and fully cooperate in the investigation. An employee's failure to fulfill his reporting obligations can include "not taking advantage of any reasonable corrective measures the employer offers after the harassment is reported." *Baldwin*, 480

F.3d at 1306. An employee is obligated to take "full advantage" of the preventative/corrective measures. *Id*. at 1307. This obligation does not end by simply making an allegation of harassment. The plaintiff must also cooperate in the investigation of the complaint. *Id*. at 1306.

Garrett's actions during the investigation of his EEOC charge are fatal to his claim. Taking all Garrett's allegations as true, Garrett failed to adequately apprise Tyco of the dimensions of the problem. Where an employee unreasonably decides to withhold information from the investigator, his decision is unreasonable and justifies imposition of the *Faragher* defense. *Baldwin*, 480 F.3d at 1307-08; *Coates*, 164 F.3d at 1365. Garrett's explanations as to why he did not report all the alleged harassment are unpersuasive. His argument regarding lack of time to prepare before speaking with Jones does not excuse his failure to report all the alleged harassment. Jones gave Garrett her cell phone number and told him to contact her for any reason. Even though he had her phone number and he remembered some additional unreported incidents, Garrett chose not to report the additional alleged harassment. That choice reflects a decision by Garrett to not fully participate in the investigation.

Additionally, the court rejects Garrett's argument regarding the complaints against him as an excuse for his failure to fully inform Jones of all the alleged harassment. First, Jones met with Garrett in March 2014. The complaints against

Garrett were not made until August 2014. (Doc. 27-3 at 22-24). Jones, therefore, could not have had any knowledge of the future complaints when she met with Garrett initially. Moreover, his failure to supplement Jones when he recalled other alleged harassment is not excused even after the women made their complaints against Garrett. A generalized fear of retaliation is not sufficient to explain a long delay in reporting harassment. *Walton*, 347 F.3d at 1290-91.

Garrett's decision not to fully inform Jones of all the alleged harassment and his decision not to fully participate and cooperate in Tyco's investigation bar his claim as a matter of law. *Baldwin*, 480 F.3d at 1307-08 (plaintiff's overall refusal to cooperate in "the company's reasonable attempt to solve the problem" was sufficient to establish the *Faragher-Ellerth* defense). The "primary objective" of the discrimination laws "is not to provide redress but to avoid harm." *Faragher*, 524 U.S. at 806. To promote this objective, the discrimination laws, and the *Ellerth/Faragher* defense in particular, are premised on a cooperative framework wherein the employee reports harassment and the employer remedies the improper conduct. "[T]he law against . . . harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999) (internal quotation marks omitted). The court understands raising problems regarding harassment can be uncomfortable for the

employee, but if courts were to allow an employee's subjective, ungrounded fears of unpleasantness or retaliation to alleviate an employee's reporting requirement, courts would "completely undermine Title VII's basic policy 'of encouraging forethought by employers and saving action by objecting employees.'" *Barrett v. Applied Radiant Energy Corp.,* 240 F.3d 262, 268 (4th Cir. 2001) (quoting *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 764).

Instead, this case provides a good example of why courts should encourage action by employees, given when Garrett did accurately inform Tyco about the full extent of a problem, the harassment stopped. Had Tyco been fully informed about the alleged scope of the harassment, there is a chance the primary goal of preventing harm would have been served. By not fully informing Tyco regarding the full scope of the alleged harassment, Garrett thwarted that goal. As a result, his claim is barred as a matter of law.

## IV.   CONCLUSION

In summary, the court concludes Thomas Foster, Theresa Hall, and Garron Mixon's claims fail because the harassment alleged was not severe or pervasive as a matter of law. In the alternative, their claims fail because they unreasonably failed to take advantage of the corrective opportunities offered by Tyco. Although the court concludes Rodney Watts, Darren Turner, and Joseph Garrett established a claim of hostile work environment, their claims fail because they unreasonably

failed to take advantage of the corrective opportunities offered by Tyco.  As such,

Defendant Tyco Fire Products, LP is entitled to judgment as a matter of law on all

the claims asserted by Plaintiffs.  Defendant's motion for summary judgment (Doc.

26) is due to be granted in full. A separate order will be entered.

      **DONE** this 14th day of March, 2018.


STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE